JASON S. HARTLEY (CA Bar No. 192514)
JASON M. LINDNER (CA Bar No. 211451)
STUEVE SIEGEL HANSON LLP
550 West C Street, Suite 1750
San Diego, CA 92101
Tel: 619-400-5822
Fax: 619-400-5832
*hartley@stuevesiegel.com*
*lindner@stueveseigel.com*

*Attorneys for Plaintiff and the Class*

*[See Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD IMMERMAN, individually and on behalf of all others similarly situated,<br><br>PLAINTIFF,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>DEFENDANT. | CASE NO._____<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. Negligence<br>2. Unjust Enrichment<br>3. Negligent Violation of FCRA<br>4. Willful Violation of FCRA<br>5. Violation of Ohio Consumer Sales Practices Act<br>6. Violation of the California Consumer Records Act, Civ. Code, §§ 1798.81.5, 1798.82 (if we think we can assert)<br>7. Violation of California Unfair Competition Law, BUS. & PROF. CODE, § 17200<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Richard Immerman ("Plaintiff"), by and through the undersigned attorneys, brings this action against Defendant Experian Information Solutions, Inc. ("Experian" or "Defendant") on behalf of himself and all others similarly situated. Plaintiff makes the following allegations upon information and belief, except as to allegations specifically pertaining to him, which are based on personal knowledge:

**NATURE OF THE ACTION**

1. This is a data breach class action on behalf of approximately 15 million American consumers whose personal information, including names, dates of birth, addresses, and Social Security numbers, among other information (collectively "PII") was stolen from Defendant Experian in a data security breach ("Security Breach").

2. The data disclosed by the Security Breach belonged to consumers who applied for wireless telephone services and/or device financing with T-Mobile, the third-largest wireless telephone carrier in the United States.

3. On September 22, 2015, Experian revealed that its information technology system had been hacked, exposing the names, birthdates, Social Security numbers, street addresses, personal identification numbers (such as military or driver's license numbers), and other details of about 15 million current and former T-Mobile customers, making it the largest data breach ever disclosed by a credit reporting bureau.

4. Plaintiff brings this class action against Experian and for its failure to secure and safeguard the PII of Plaintiff and members of the proposed Class (defined below).

5. Defendant's security failures enabled hackers to steal extremely sensitive information from within Experian's system, placing Plaintiff and Class members' PII at serious and ongoing risk. The stolen information is currently for sale

on the dark web and the hackers continue to use the information they obtained as a result of Defendant's inadequate security to exploit and injure Class members across the United States. Possession of Plaintiff and Class members' PII enables data thieves to commit a variety of crimes, including, but not limited to, taking out loans in the their name; opening new financial or utility accounts in their name; using their name to file a fraudulent tax return; using their information to obtain government benefits or obtain a license or identification card.

6.      The Security Breach was caused and enabled by Experian's knowing violation of its obligations to abide by best practices and industry standards in protecting customers' and employees' personal information. Experian grossly failed to comply with security standards and allowed its customers' PII to be compromised.

7.      As a result of the breach, Plaintiff and the Class have been exposed to heightened and imminent risk of fraud and identity theft. Plaintiff and the class must now and in the future closely monitor their financial accounts to guard against identity theft. Plaintiff and the Class may be faced with fraudulent debt, or incur costs for, among other things, paying monthly or annual fees for identity theft and credit monitoring services, obtaining credit reports, credit freezes, and other protective measures to deter, detect, and mitigate the risk of identity theft and fraud.

8.      Accordingly, Plaintiff, on behalf of himself and other members of the Class, asserts claims for negligence, unjust enrichment, willful and/or reckless violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*, negligent violation of the FCRA, 15. U.S.C. § 1681 *et seq.*, violation of the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.02, violation of the California Consumer Records Act, Civ. Code §§ 1798.81.5, 1798.82, and violation of California's Unfair Competition Law, BUS. & PROF. CODE, § 17200. Plaintiffs seek remedies including, but not limited to, statutory damages, reimbursement of out-of-pocket losses, further credit monitoring services with accompanying identity theft insurance, improved data security, and where applicable, attorneys' costs and fees.

## **PARTIES**

1.  Plaintiff Richard Immerman a resident of Cuyahoga County in the State of Ohio, was a customer of T-Mobile, and applied for wireless telephone services and/or device financing with T-Mobile in between September 1, 2013 and September 16, 2015. Plaintiff's PII was compromised and stolen as a result of the Security Breach.

2.  Defendant Experian Solutions, Inc. is an Ohio corporation with its principal offices located at 475 Anton Blvd., Costa Mesa, California, 92626. Experian operates Experian North America, which is one of the three biggest credit bureaus (along with Equifax and TransUnion) providing credit reporting to customers in the United States.

## **JURISDICTION AND VENUE**

3.  This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because the putative class brings claims under the federal Fair Credit Reporting Act, 15 U.S.C. §§ 1681e, *et seq.*

4.  This Court also has subject matter jurisdiction based on diversity, pursuant to 28 U.S.C. § 1332(d) over all other claims. In the aggregate, Plaintiff's claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous class members who are citizens of States other than Defendant's two States of citizenship.

5.  This Court has personal jurisdiction over Defendant because Defendant is headquartered in the forum State, and as such has such minimum contacts with California as to make this Court's exercise of jurisdiction proper. Defendant engages in continuous and systematic business operations within this State and this District.

6.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant Experian is headquartered here and regularly transacts business in this District.

# FACTUAL ALLEGATIONS

*The Security Breach*

7.      On October 1, 2015, Defendant Experian issued a press release stating:

> Experian North America today announced . . . [it had] experienced an unauthorized acquisition of information from a server that contained data on behalf of one of its clients, T-Mobile USA, Inc. The data included some personally identifiable information for approximately 15 million consumers in the US, including those who applied for T-Mobile USA postpaid services or device financing from September 1, 2013 through September 16, 2015, based on Experian's investigation to date . . . .[1]

8.      The press release noted that the data acquired by thieves included "names, dates of birth, addresses, and Social Security numbers and/or an alternative form of ID like a drivers' license number, as well as additional information used in T-Mobile's own credit assessment."[2]

9.      In addition, Experian itself noted in a release on its website, posted October 1, 2015, that "T-Mobile applicants who applied for services from Sept. 1, 2013 through Sept. 16, 2015 had unauthorized disclosure of their personal information." The release also noted that this exposure could lead to an increased risk of identity theft, and offered advice on how to avoid "phising" schemes, and proposed solutions for dealing with the breach, including having consumers place a fraud alert or security freeze on their credit files.

10.     T-Mobile, in an open letter from its CEO, stated "[W]hat we know right now is that the hacker acquired the records of approximately 15 million people, including new applicants requiring a credit check for service or device financing from

---

[1] *Experian Notifies Consumers In The U.S. Who May Have Been Affected By Unauthorized Acquisition of A Client's Data*, PR NEWSWIRE, (Oct. 1, 2015), http://www.prnewswire.com/news-releases/experian-notifies-consumers-in-the-us-who-may-have-been-affected-by-unauthorized-acquisition-of-a-clients-data-300152926.html (last visited Oct. 22, 2015).

[2] *Id.*

September 1, 2013 through September 16, 2015. These records include information such as name, address and birthdate as well as encrypted fields with Social Security number and ID number (such as driver's license or passport number), and additional information used in T-Mobile's own credit assessment. Experian has determined that this encryption may have been compromised."[3]

11.     Experian's security failures enabled the perpetrators of the Security Breach to steal highly sensitive identifying information from within Experian's system and, on information and belief, subsequently appropriate Class members' identities and otherwise put Class members' PII at serious and ongoing risk. The hackers continue to use the information they obtained as a result of Experian's inadequate security to exploit and injure Class members nationwide.

12.     The Security Breach was caused and enabled by Experian's knowing violation of its obligations to abide by best practices and industry standards in protecting PII. Because of the extremely sensitive nature of the PII at issue, Experian had a duty to employ necessary measures to ensure that the PII was not accessed, compromised, or stolen. However, Experian failed to comply with security standards and allowed its customers' and employees' PII to be taken by thieves.

13.     Social Security numbers are a form of national identifier and are not easily replaced. The Federal Trade Commission ("FTC") warns consumers to protect their social security numbers, and to give out the number only if absolutely necessary. *See* Recovering from Identity Theft, FTC, *available at* www.ftc.gov/idtheft (last visited on October 22, 2015). Similarly, the Social Security Administration warns consumers to safeguard their social security numbers and to be careful about sharing them. *See* Identity Theft and Your Social Security Number, Social Security Administration, *available at* http://www.ssa.gov/pubs/EN-05-10064.pdf (last visited on October 8, 2015).

---

[3] *T-Mobile CEO on Experian's Data Breach*, http://www.t-mobile.com/landing/experian-data-breach.html (last visited Oct. 22, 2015).

14.   The threat to the credit rating industry is particularly pressing, as a person's credit has an impact on almost every sector of their financial lives, including their ability to buy or rent a home, purchase transportation, finance education, and obtain employment. This gives criminals significant incentive to target credentials kept by businesses such as Experian.

15.   Nevertheless, Experian's security failures allowed widespread and systematic theft of Class members' personal identifying information. Experian's actions did not meet the standards of commercially reasonable steps that should be taken to protect this information.

16.   To date, Experian has failed to offer any explanation for the cause of the breach, how the hackers were able to access Plaintiff's and proposed Class members' PII, and what steps, if any, Experian has taken or will take in the future to ensure that the PII stored in its database will be adequately protected.

17.   Indeed, the stolen Experian information has already surfaced for sale on underground marketplaces known as the dark web. The stolen Experian information is being marketed and sold as "bundled" packages of hacked data that includes a person's social security number, date of birth, driver's license information, email, phone number and home address. This "bundled" sale of consumer information can be used to easily and efficiently perpetrate identity theft and any number of serious frauds.

18.   Plaintiff and the Class have suffered additional injury in fact and actual damages including: monetary losses arising from the costs associated with identity theft and the increased risk of identity theft caused by Experian's wrongful conduct, mitigation costs and expenses including costs to obtain and review credit reports, place credit freezes, or purchase identity theft and credit monitoring services in order to monitor for identity theft and fraudulent activity resulting from the Security Breach, and damages based on the opportunity cost and value of time that Plaintiff and the Class have been forced to expend to ensure their identities are not stolen as a

result of the Security Breach. Plaintiff and the Class have also suffered the loss of the inherent value of their PII itself.

*Security Breaches Lead to Identity Theft*

19.     The United States Government Accountability Office noted in a June 2007 report on Data Breaches ("GAO Report") that identity thieves use PII to open financial accounts, receive government benefits, and incur charges and credit in a person's name.[4] As the GAO Report states, this type of identity theft is the most harmful because it may take some time for the victim to become aware of the theft and can adversely affect the victim's credit rating. In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name[s]."

20.     According to the FTC, identity theft wreaks havoc on consumers' finances, credit history, and reputation, and can take time, money, and patience to resolve.[5] Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[6]

21.     A person whose personal information has been compromised may not see any signs of identity theft for years. According to the GAO Report:

---

[4] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO (June 2007), http:///www.gao.gov/new.items/d07737.pdf (last visited October 22, 2015).

[5] *Taking Charge, What to Do If Your Identity is Stolen*, FTC, (2012), http://www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf (last visited October 22, 2015).

[6] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id.*

CLASS ACTION COMPLAINT

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

22.    PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for a number of years.[7] As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen credit card numbers and other PII directly on various Internet websites, making the information publicly available.

### The Monetary Value of Privacy Protections

23.    At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information as follows:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[8]

---

[7] Companies, in fact, also recognize PII as an extremely valuable commodity akin to a form of personal property. For example, Symantec Corporation's Norton brand has created a software application that values a person's identity on the black market. Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessment-tool.html. *See also* T. Soma, ET AL, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009).

[8] *The Information Marketplace: Merging and Exchanging Consumer Data*, https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf  (last visited October 22, 2015).

CLASS ACTION COMPLAINT

24.     Though Commissioner's Swindle's remarks are more than a decade old, they are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the United States.[9]

25.     The FTC has also recognized that consumer data is a new—and valuable—form of currency. In a recent FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point by observing:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[10]

26.     Recognizing the high value that consumers place on their PII, many companies now offer consumers an opportunity to sell this information to advertisers and other third parties. The idea is to give consumers more power and control over the type of information that they share—and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from the surrender of their PII.[11] This business has created a new market for the sale and purchase of this valuable data.[12]

---

[9] Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, THE WALL STREET JOURNAL (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited October 22, 2015).

[10] *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited October 22, 2015).

[11] Steve Lohr, *You Want My Personal Data? Reward Me for It*, (July 17, 2010), THE NEW YORK TIMES, http://www.nytimes.com/2010/07/18/business/18unboxed.html (last visited October 22, 2015).

[12] *See supra,* fn.9.

27.    Consumers place a high value not only on their PII, but also on the *privacy* of that data. Researchers have already begun to shed light on how much consumers value their data privacy – and the amount is considerable. Indeed, studies confirm that "when [retailers'] privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[13]

28.    When consumers were surveyed as to how much they valued their personal data in terms of its protection against improper access and unauthorized secondary use—two concerns at issue here—they valued the restriction of improper access to their data at between $11.33 and $16.58 per website, and prohibiting secondary use to between $7.98 and $11.68 per website.[14]

29.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

**Experian's Troubling History of Data Security Failures**

30.    On October 8, 2015, security blogger Brian Krebs wrote about his investigation into Experian's troubling history of failing to protect customer data and focus on expansion and profits rather than data security.[15]

31.    Krebs noted that he had interviewed "a half-dozen security experts who said they recently left Experian to find more rewarding and less frustrating work at

---

[13] Hann et al., *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at 2, *available at* http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited October 22, 2015); Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (June 2011).

[14] *Id.*

[15] Brian Krebs, *At Experian, Security Attrition Amid Acquisitions*, KREBS ON SECURITY, (Oct. 8, 2015), http://krebsonsecurity.com/tag/experian-breach/ (last visited Oct. 20, 2015).

other corporations. Nearly all described Experian as a company fixated on acquiring companies in the data broker and analytics technology space, even as it has stymied efforts to improve security and accountability [at Experian]."[16]

32.     Krebs wrote that Jasun Tate, who worked for a year until April 2014 as a chief information security officer delegate and risk consultant at Experian's government services and e-marketing business units, said that he and several of his colleagues left last year after repeatedly running into problems getting buy-in or follow-up support for major projects to beef up security around Experian's growing stable of companies handling sensitive consumer and government data. "What the board of directors at Experian wanted security-wise and the security capabilities on the ground were two completely different things," Tate said. "Senior leadership there said they were pursuing a very aggressive growth-by-acquisition campaign. The acquisition team would have a very strict protocol on how they assess whether a business may be viable to buy, but the subsequent integration of the business into our core security architecture was just a black box of magic in terms of how it was to be implemented. And I'm not saying successful magic at all."[17]

33.     Moreover, according to Krebs, "[a]nother recent former security employee at Experian who agreed to talk on condition of anonymity said it was clear that the company's board was not well-informed about the true state of security within the company's various business units. 'When I was there, the board was very big on security and wanting to invest in it and make sure we were doing what we needed to do in order to avoid situations just like this,' the source said. 'In my opinion, there's no way the board was told the whole story, because if they had been then things wouldn't be where they are are now. We wouldn't be talking about this. Some things had to have been hidden or spun in a way to look positive somehow.'"[18]

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

CLASS ACTION COMPLAINT

34.     According to Krebs, data security took a turn for the worse after former Chief Information Officer (CIO) John Finch left Experian. "Multiple former Experian security employees said that for years Experian seemed to be making great progress on establishing security as a core priority across the mammoth company. All interviewed directly attributed that progress to the leadership of then-[CIO] John Finch, who helped hire and build up a staff of nearly 30 talented professionals to monitor Experian's security "brain" — the "security operations center" or SOC for short. The SOC is designed to pull together real-time alerts about cyber attacks, as well as provide assessments about vulnerabilities across the organization's far-flung computers and networks. After Finch was lured away to take the CIO job at the Bank of England, many of the major in-progress projects designed to bake security into all aspects of Experian's business ground to a halt, the former employees said on condition of anonymity. Core members of the Experian security team soon began seeking employment elsewhere. A year after Finch's departure, morale suffered and the staff of the company's SOC had dwindled from nearly 30 to about a dozen."[19]

35.     Former Experian employees told Krebs after Finch's departure, everything changed. "We had a period of time there where security was viewed in a positive light, and things weren't being swept under the rug for the sake of uptime." the employee said. "He left and it kind of went the opposite direction. Once the leadership changed, the focus changed to controlling costs and not taking systems down for maintenance, and investments started disappearing from a lot of areas. We were in the middle of putting into operation certain tools to do next-generation detection of [cyber] threats, but we weren't able to get many of them out into production. And that's how Experian wound up where they are now."[20]

---

[19] *Id.*

[20] *Id.*

36.     Experian's lack of commitment to data security has subjected the company to a troubling number of data breaches in the just the last few years alone.

37.     In March 2012, Experian acquired Court Ventures, Inc., a company that aggregated, repackaged and sold public record data from more than 1,400 state and county sources. One of Court Ventures, Inc.'s existing customers was Hieu Minh Ngo, a Vietnamese national who posed as a private investigator and paid for access to Court Ventures, Inc.'s consumer records via cash wire transfers from a bank in Singapore. Through his contract with Court Ventures, Inc., Ngo was able to access and make available to his clients the U.S. Info Search database containing social security numbers, dates of birth and other records on more than 200 million Americans.[21]

38.     In acquiring Court Ventures, Inc., "Experian's acquisition team neglected to do 'due diligence' on Court Ventures' existing customers."[22] As a result, for almost ten months after Experian completed that acquisition, Ngo continued siphoning consumer data and making wire transfers.

39.     In 2013, Ngo was arrested after he was lured to Guam with the offer of access to more consumer data by an undercover U.S. Secret Service agent. The government alleged that Ngo made nearly $2 million from his services selling access to "fullz," which—as described further below—is the slang term for full packages of consumer data that can be used to commit identity theft and fraud. The IRS believed Ngo had access to the personal data, including social security numbers, of more than 200 million Americans and sold the information of at least 1,300 Americans. The sale

---

[21] Brian Krebs, *Experian Lapse Allowed ID Theft Service Access to 200 Million Consumer Records*, KREBS ON SECURITY, (March 10, 2014), http://krebsonsecurity.com/2014/03/experian-lapse-allowed-id-theft-service-to-access-200-million-consumer-records/ (last visited Oct. 20, 2015).

[22] Brian Krebs, *At Experian, Security Attrition Amid Acquisitions*, KREBS ON SECURITY, (Oct. 8, 2015), http://krebsonsecurity.com/tag/experian-breach/ (last visited Oct. 20, 2015).

of this information resulted in $65 million in fraudulent individual income tax return filings. In 2015, Ngo was sentenced to 13 years in U.S. federal prison.

40.    Another breach soon followed, again involving T-Mobile customers. On December 30, 2013, T-Mobile said it notified a "relatively small" number of customers that unauthorized access to a file stored on servers owned by Experian had exposed social security numbers and driver's license numbers. T-Mobile identified the breached vendor as Decisioning Solutions, an identity-proofing and authentication company that was acquired by Experian in April 2013.[23]

41.    Krebs noted that within hours of Experian's acquisition of Decision Analytics, "KrebsOnSecurity was contacted by an anonymous source who sent this author a Web link that, when clicked, opened up a support ticket within that Decision Analytics platform in the United Kingdom — *with absolutely no authentication needed.*" This permitted hackers to access files across a range of Experian's business units and "upload arbitrary file attachments of virtually any file type . . . to inject malicious files into databases and other computing environments."[24] After the unauthorized access was discovered, a letter to affected T-Mobile customer stated: "Although we believe the primary goal of the access was to obtain credit card numbers (which were not included in the file), the information that was accessible could also potentially be misused. Our supplier has taken immediate measures to secure the impacted servers."[25]

42.    On October 1, 2015, Experian announced its third major data security breach in less than three years when it admitted than an "internal server" had been compromised and exposed the names, dates of birth, addresses, social security numbers and/or drivers' license numbers, as well as additional information used in T-

---

[23] *Id.*

[24] *Id.*

[25]          http://doj.nh.gov/consumer/security-breaches/documents/t-mobile-usa-20131230.pdf (last visited Oct. 22, 2015).

Mobile's credit assessments, of 15 million T-Mobile customers. As alleged further below, this information is already being sold in bundles on the dark web.

43.    On October 7, 2015, U.S. Senators from Connecticut, Florida, and Hawaii wrote letters to T-Mobile CEO John Legere and Experian CEO Brian Cassin stating:

> We write with regard to the recent reported data security breach at Experian, which may have exposed the names, address, birth dates and Social Security numbers of fifteen million T-Mobile customers. This news is extremely troubling to us given the sensitive nature of the compromised personal data, and its particular value to identity thieves.
>
> Unlike bank account numbers, which can be deleted as soon as a bank identifies fraud, Social Security numbers are hard to change and are tied to tax forms, credit cards, mortgages, bank accounts, health insurance, and medical records. By learning someone's Social Security number, a criminal can obtain credit cards in a victim's name, wire money from a victim's bank account, or even access tax and medical records. According to the Department of Justice, 64 percent of the 17.6 million victims of identity theft in 2014 experienced a direct financial loss resulting from personal information fraud. This is particularly distressing based on your companies' reported breach, because victims of personal information fraud lost an average of $7,761 compared to victims of bank or credit card fraud who lost an average of $780.
>
> The Senate Committee on Commerce, Science, and Transportation has jurisdiction over commercial online practices and data security, and, as Ranking Members of the full Committee, the Subcommittee on Consumer Protection, Product Safety, Insurance and Data Security, and the Subcommittee on Communications, Technology, Innovation and the Internet, we have been advocates for data security and breach notification legislation that would better protect consumers and improve corporate responsibility. Experian and T-Mobile's recent incident demonstrates the need for legislation that addresses both consumer notification and sets minimum security requirements for companies that collect and store such sensitive consumer data.
>
> We request that Experian's information-security executives provide a detailed accounting to the Committee regarding your investigations and latest findings on the circumstances that permitted unauthorized access

to the personal information of so many Americans. We expect that your security experts have had enough time to thoroughly examine the cause and impact of the breach and will be able to provide the Committee with detailed information.[26]

44.     To date, Experian has not provided a response to the letters.

45.     Following the breach, Experian offered affected individuals two free years of credit monitoring services from ProtectMyID, a service provided by Experian. Experian's self-serving attempt to direct affected consumers to its own product following the breach it created caused an immediate backlash from affected individuals who did not want more of their sensitive information to be stored by Experian. The outcry from users prompted T-Mobile CEO John Legere to promise that alternative monitoring options would be made available.

46.     Although credit monitoring can help detect fraud after it has already occurred, it has very little value as a preventative measure and is certainly not a cure-all. As noted by Krebs, "although [credit monitoring] services may alert you when someone opens or attempts to open a new line of credit in your name, most will do little — if anything — to block that activity. My take: If you're being offered free monitoring, it probably can't hurt to sign up, but you shouldn't expect the service to stop identity thieves from ruining your credit."[27]

47.     Unfortunately, Experian is still more concerned with limiting its exposure rather than fixing the underlying problems with its data security and protection. As noted by Fight for Future, a nonprofit group focused on Internet access and freedom, "Experian has been hacked more than 100 times, but instead of

---

[26] *Blumenthal, Nelson, Schatz, Demand Answers from T-Mobile and Experian Following Security Breach of 15 Million Customers*, (Oct. 7, 2015), http://www.blumenthal.senate.gov/newsroom/press/release/demand-answers-from-t-mobile-and-experian (last visited (Oct. 22, 2015).

[27] Brian Krebs, *Are Credit Monitoring Services Worth It?*, KREBS ON SECURITY, (March 19, 2014), http://krebsonsecurity.com/2014/03/are-credit-monitoring-services-worth-it/ (last visited Oct. 20, 2015).

improving their inadequate digital security, they are spending money lobbying Congress to pass CISA, the Cybersecurity Information Sharing Act, a bill that may give companies like them legal immunity in the event of a hack, as long as they share data with the government."[28]

48.     As noted by one cyber-security expert, "When you type 'Experian' into Google, the suggested first result is 'Experian data breach', the next results are 'Experian data breach 2014' and 'Experian data breach 2013'. If this isn't a wake up call to take action, I don't know what is."[29] Unfortunately, Experian has not received the "wake up call" it desparately needs.

### The Stolen Experian Information Has Already Surfaced on the Dark Web

49.     On October 1, 2015, the same day the Experian breach was announced, fraud prevention and security firm Trustev produced screen shots of dark web listings of stolen data it believed originated from the Experian breach. In a statement, Trustev stated that: "This morning [our researchers] saw listings go up for 'fullz' data that matches the same types of information that just came out of the Experian hack."

50.     The sale of "fullz" data on the dark web refers to the sale of a full package of an individual's personal identifying information. In this case, the bundled information that surfaced for sale included social security numbers, dates of birth, identification number (typically a driver's license, military ID, or passport number), emails, and phone numbers and home addresses, all of which were used in T-Mobile's own credit assessment and are consistent with the data stolen from Experian. The fact that this bundled information is already for sale demonstrates that affected

---

[28] James R. Hood, *Critics say Experian CEO should resign after the latest data breach*, CONSUMER AFFAIRS, Oct. 5, 2015, https://www.consumeraffairs.com/news/critics-say-experian-ceo-should-resign-after-the-latest-data-breach-100515.html (last visited Oct. 20, 2015).

[29] Daniel Thomas and David Crow, *T-Mobile US 'incredibly angry' at Experian over data breach*, FINANCIAL TIMES, Oct. 2, 2015, http://www.ft.com/cms/s/0/226e970e-6901-11e5-97d0-1456a776a4f5.html (last visited Oct. 20, 2015).

individuals are currently at risk for identity theft and fraud and will be for years into the future.

51.     Unlike stolen payment card data, many individuals affected by the Experian breach do not have the option to change their name, social security number, address and other personally-identifiable information in order to protect their identity and prevent fraud. Under U.S. Social Security Administration (SSA) policy, individuals cannot obtain a new social security number until there is evidence of ongoing problems due to misuse of the Social Security number. Even then, the SSA recognizes that "a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start."[30]

52.     In fact, a new social security number is substantially less effective where "other personal information, such as [the victim's] name and address, remains the same" and for some victims, "a new number actually creates new problems. If the old credit information is not associated with [the victim's] new number, the absence of any credit history under your new number may make it more difficult for [the victim] to get credit."[31]

***Damages Sustained By Plaintiff and the Class***

53.     As a result of the actions documented above, Plaintiff and the Class have suffered damages arising from the costs associated with identity theft and the increased risk of identity theft caused by Experian's wrongful conduct, particularly given the actual expenditures undertaken in response to this risk.

---

[30] U.S. Social Security Administration, *Identity Theft And Your Social Security Number*, http://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Oct. 20, 2015).

[31] *Id.*

54.     Plaintiff and the Class have suffered additional damages based on the opportunity cost and value of time that Plaintiff and the Class have been forced to expend to ensure their identities are not stolen as a result of the Security Breach. Plaintiff and the Class have also suffered damages through the loss of the cognizable value inherent in their PII itself.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action on his own behalf, and on behalf of a Class pursuant to FED. R. CIV. P. 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All citizens of the United States who had their personal information compromised as a result of the data breach announced by Experian on October 1, 2015 (the "National Class").

56.     In the alternative, Plaintiff also brings this action on his own behalf, and on behalf of a state sub-class, pursuant to FED. R. CIV. P. 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All citizens of the State of Ohio who had their personal information compromised as a result of the data breach announced by Experian on October 1, 2015 (the "Ohio State Class").

57.     Excluded from the Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) governmental entities. Plaintiff reserve the right to amend the class definitions if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

58.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

59.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, Class members number approximately 15 million. The precise number of Class members and their addresses are presently unknown to Plaintiff, but may be ascertained from Experian's records. Class members may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

60.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include:

a.   Whether Experian acted negligently in failing to safeguard Plaintiff and the Class members' PII;

b.   Whether Experian was unjustly enriched at the expense of Plainitff and Class members;

c.   Whether Experian's willfully and/or recklessly failed to maintain reasonable procedures designed to limit the furnishing of consumer reports for the purposes outlined in § 1681b of the FCRA;

d.   Whether Experian negligently failed to maintain reasonable procedures designed to limit the furnishing of consumer reports for the purposes outlined in § 1681b of the FCRA;

e.   Whether Experian's conduct violates the California Consumer Records Act, Civ. Code, §§ 1798.81.5, 1798.82;

f.   Whether Experian violated the California Unfair Competition Law, BUS. & PROF. CODE, § 17200;

g.   Whether Experian's conduct violated the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.02; and

h.   Whether Plaintiff and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief.

61.   Experian engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any exist, pale in comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

62.   **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other Class members because, among other things, all Class members were comparably injured through Experian's uniform misconduct described above and were thus all subject to the Security Breach alleged herein. Further, there are no defenses available to Experian that are unique to Plaintiff.

63.   **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other Class members he seeks to represent; he has retained counsel competent and experienced in complex class action litigation; and Plaintiff will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

64.   **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Experian, so it would be impracticable for Class members to individually seek redress for Experian's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all

parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and the National Class or in the
Alternative on Behalf of Plaintiff and the Ohio State Class)**

65.     Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

66.     Experian owed numerous duties to Plaintiff and Class members whose information it stored, including duties:

    a.   to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting PII in its possession;

    b.   to protect Plaintiff and Class members' PII using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

    c.   to implement processes to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiff and Class members of a breach of their PII.

67.     Plaintiff owed a duty of care not to subject Plaintiff and Class members, along with their PII, to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices. Experian solicited, gathered, and stored Plaintiff and Class members' PII in order to maintain credit profiles and provide credit reports to inquiring entities.

68.     Experian knew, or should have known, of the risks inherent in collecting and storing Plaintiff and Class members' PII and the importance of adequate security. Experian received warnings for years from within and outside the company that

hackers routinely attempted to access PII without authorization, including having suffered multiple other data breaches in the last several years.

69.    Experian knew, or should have known, that its servers did not adequately safeguard Plaintiff and Class members' PII.

70.    Because Experian knew that a breach of its servers would damage millions of consumers, it had a duty to adequately protect their PII.

71.    Experian has a special relationship with Plaintiff and Class members because (1) Experian knows that the methods and systems it uses to store and provide access to others of consumers' PII is intended to and does affect consumers, including Plaintiff and Class members; (2) the data breach was a foreseeable and probable result of inadequate security practices; (3) Plaintiff and Class members have suffered injuries or are at an imminent risk to suffer injuries as a result of Experian's breach because their PII has already been sold to identity thieves and their stolen PII cannot be easily changed; (4) there is a close causal connection between Experian's conduct and the injuries suffered Plaintiff and Class members; (5) Experian is morally responsible for the breach because it was aware that it is a frequent target of unauthorized hacks and instead focused on generating profits rather than protecting and safeguarding consumers' PII that it stores and uses for its own financial benefit; and (6) there is a strong public policy in favor of preventing future data breaches of this type.

72.    Experian's own conduct also created a foreseeable risk of harm to Plaintiff and Class members and their PII. Experian's misconduct included failing to: (1) secure its servers despite knowing their vulnerabilities; (2) comply with industry standard security practices despite having been breached many times previously; (3) implement adequate system and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

73.    Experian also had independent duties under state laws that required Experian to reasonably safeguard Plaintiff and Class members' PII and promptly

notify them about the data breach, including state consumer protection laws, data breach notification laws, and Section 5 of the Federal Trade Commission Act.

74.     Experian breached the duties it owed to Plaintiff and Class members in numerous ways, including:

a. by creating a foreseeable risk of harm through the misconduct previously described;

b. by failing to implement adequate security systems, protocols and practices sufficient to protect their PII;

c. by failing to comply with the minimum industry data security standards; and

d. by failing to timely and accurately disclose that their PII had been improperly acquired or accessed.

75.     But for Experian's wrongful and negligent breach of the duties it owed Plaintiff and Class members, their PII either would not have been compromised or they would have been able to prevent some or all of their damages.

76.     The injury and harm that Plaintiff and Class members suffered as alleged above) was the direct and proximate result of Experian's negligent conduct. Accordingly, Plaintiff and Class members have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT II
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Ohio State Class)

77.     Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

78.     Plaintiff and Class members conferred a monetary benefit on Experian by permitting Experian to store, access and sell their PII to inquiring entities.

79.   Experian appreciated or knowledge of the benefits conferred upon them by Plaintiff and Class Members as Experian generates billions of dollars per year from the sale of consumer reports containing Plaintiff and Class members' PII.

80.   The profits Experian generated from the sale of Plaintiff and Class members' PII were supposed to be used by Experian, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

81.   Had Plaintiff and Class members known that Experian would not secure their PII using adequate security, they would not have permitted third-party companies to provide information to Experian regarding Plaintiff and Class members or request information from Experian regarding Plaintiff and Class members, thus eliminating Experian's most valuable revenue streams.

82.   Under principals of equity and good conscience, Experian should be required to disgorge any profit it made from the sale of Plaintiff and Class members' PII because Experian failed to implement (or adequately implement) the data privacy and security practices and procedures when storing Plaintiff and Class members' PII.

83.   Plaintiff and Class members have no adequate remedy at law.

84.   Under the circumstances, it would be unjust for Experian to be permitted to retain any of the benefits that Plaintiff and Class members conferred on Experian.

85.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Experian traceable to Plaintiff and Class members.

## COUNT III
### NEGLIGENT VIOLATION OF
### THE FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681, *et seq.*
### (On Behalf of Plaintiff and the National Class)

86.   Plaintiff repeats and re-alleges the above allegations as if fully set forth herein.

87.   The Fair Credit Reporting Act ("FCRA") defines a "consumer reporting agency" as:

CLASS ACTION COMPLAINT

> [A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f).

88.    The FCRA defines a "consumer report" as:

> [A]ny written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under [15 U.S.C. §] 1681(b).

15 U.S.C. § 1681a(d)(1).

89.    The compromised data in this case qualifies as a consumer report because it was a communication of information bearing on class members' credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living used for the purpose of serving as a factor in establishing the class members' eligibility for credit.

90.    As a consumer reporting agency, Experian had a duty to "maintain reasonable procedures designed to . . . limit the furnishing of consumer reports to the purposes listed under section 1681b of this title." 15 U.S.C. § 1681e(a).

91.    Defendant negligently failed to adopt and maintain reasonable procedures designed to limit the furnishing of consumer reports to the purposes listed under 15 U.S.C. § 1681b.

92.    Plaintiff's and the other Class members' PII was wrongfully disseminated to the public as a direct and foreseeable result of Defendant's failure to adopt and maintain such reasonable procedures.

93.    As a direct or proximate result of Defendant's negligent violations of FCRA, as described above, Plaintiff's and Class members' PII was made accessible to unauthorized third parties in the public domain, compromised, and stolen. Plaintiff suffered individual harm as a result of Defendant's negligent violations of FCRA.

94.    As a further direct or proximate result of Defendant's negligent violations of FCRA, as described above, Plaintiff and Class members were (and continue to be) injured and have suffered (and will continue to suffer) the damages described in detail above.

95.    Plaintiff and the other Class members, therefore, are entitled to compensation for their actual damages, as well as attorneys' fees, litigation expenses, and costs, pursuant to 15 U.S.C. § 1681o(a).

## COUNT IV
### WILLFUL VIOLATION OF THE
### FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681, *et seq.*
### (In the alternative to Count III and on Behalf of Plaintiff and the National Class)

96.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

97.    The FCRA requires the adoption of reasonable procedures with regard to, *inter alia*, the confidentiality and proper utilization of personal and insurance information. 15 U.S.C. § 1681(b). The FCRA also requires that consumer reporting agencies "maintain reasonable procedures designed to . . . limit the furnishing of consumer reports to the purposes listed under section 1681b of this title." 15 U.S.C. § 1681e.

98.    Defendant failed to adopt and maintain these and other reasonable procedures designed to limit the furnishing of consumer reports to the purposes listed

under 15 U.S.C. § 1681b. In addition to properly securing, monitoring, and encrypting Plaintiff's and Class Members' PII on its database, accepted industry practice dictates Experian should have taken the following measures:

    a) Conducted periodic risk assessments and gap analysis relating to privacy and information security-related policies, processes and procedures; and

    b) Developed privacy and information security related performance and activity metrics, such as the performance of ongoing compliance reviews, physical walkthroughs, hotline and complaint management—and ensure that these metrics were an integral part of Experian's corporate governance program.

99.    On information and belief, Experian failed to take reasonable and appropriate measures to secure, safeguard and protect Plaintiff's and Class members' PII. Experian also failed to place itself in a position to immediately notify Plaintiff and Class Members about the Security Breach.

100.    Plaintiff's and Class members' PII affected by the Security Breach was contained in what constitutes a consumer report as defined by FCRA. Their PII included information bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for credit or insurance to be used primarily for personal, family, or household purposes or employment purposes under FCRA's definition of "consumer report". *See* 15 U.S.C. § 1681a(d)(1)(a-c).

101.    Defendant's violation of FCRA, as set forth above, was willful or, at the very least, reckless, constituting willfulness. In light of previous high-profile data breaches highlighting large corporations' increased vulnerability to cyberattacks, Experian's violation of the FCRA was willful.

102.   As a result of Defendant's willful or reckless failure to adopt and maintain reasonable procedures to limit the furnishing of Plaintiff's and Class members' PII to the purposes listed under 15 U.S.C. § 1681b, Plaintiff's and the other Class members' PII was disseminated to unauthorized third parties, compromised, and stolen. Plaintiff and Class members suffered harm as a result of Defendant's willful or reckless violations of FCRA.

103.   As a further direct or proximate result of Defendant's willful or reckless violations of FCRA, as described above, Plaintiff and Class members were (and continue to be) injured and have suffered (and will continue to suffer) the damages described in detail above.

104.   Plaintiff and Class members, therefore, are entitled to compensation for their actual damages or statutory damages of not less than $100, and not more than $1,000, each, as well as attorneys' fees, litigation expenses and costs, pursuant to 15 U.S.C. § 1681n(a).

## COUNT V
### VIOLATIONS OF THE CALIFORNIA CUSTOMER RECORDS ACT, CAL. CIV. CODE § 1798.80, *et seq.*
### (On Behalf of Plaintiff and the National Class)

105.   Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

106.   Experian is a "business" as that term is defined in Cal. Civ. Code § 1798.80(a).

107.   Plaintiff and the Class members are "individual[s]" as that term is defined in Cal. Civ. Code § 1798.80(d).

108.   Plaintiff and the Class members had "personal information" compromised as a result of the Security Breach, as that term is used in both Cal. Civ. Code 1798.80(e) and 1798.81.5(d)(1)(C).

109.   The Security Breach constitutes a "breach of the security system" pursuant to Cal. Civ. Code § 1798.82(g).

110.   Experian, under Cal. Civ. Code § 1798.81.5, had an obligation to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure.

111.   Experian's policies and procedures regarding data protection and retention violated Cal. Civ. Code § 1798.81.5, as Experian's measures were unreasonable and wholly failed to prevent access to, and disclosure of, its current and former customers' and employees' personal information.

112.   Experian also violated Cal. Civ. Code § 1798.82 by failing to notify Plaintiff and the Class members that their personal, confidential, and highly sensitive information had been compromised and/or stolen by hackers.

113.   As a result of Experian's conduct as described herein, Plaintiff and the Class members have been injured.

114.   Plaintiff seeks monetary damages, including damages related to the acquisition of identity theft and credit monitoring services, injunctive and declaratory relief pursuant to Cal. Civ. Code § 1798.84(e), and attorneys' fees and costs.

### COUNT VI
### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE § 17200, *et seq.*
### (On Behalf of Plaintiff and the National Class)

115.   Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

116.   California's Unfair Competition Law, Business & Professions Code § 17200, *et seq.* ("UCL") prohibits acts of "unfair competition", which is defined by Business & Professions Code § 17200 as including any "any unlawful, unfair or

fraudulent business act or practice . . . ."

117.   Experian's conduct constitutes unlawful and unfair practices because it constitutes violations of Cal. Civ. Code § 1798.80, *et seq.*, in that Experian failed to comport with a reasonable standard of care and public policy as reflected in statutes such as the Information Practices Act of 1977, Cal. Civ. Code § 1798, *et seq.*, and the California Consumer Records Act, Civ. Code § 1798.80, *et seq.*, which are designed to protect individuals' data and ensure that entities who solicit or are entrusted with personal data utilize reasonable security measures.

118.   Experian's conduct was also unlawful and in violation of Cal. Civ. Code § 1782.82 because Defendant unreasonably delayed in informing Plaintiff and the Class about the breach of security after Defendant knew or should have known that the data breach occurred.

119.   Experian's conduct was "unfair" as defined by the UCL's unfair prong analysis because its acts and/or omissions were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and the members of the Class, and because their acts and/or omissions constitute conduct that undermines or violates the stated policies underlying the California Customer Records Act and other applicable privacy statutes, both from California and from other states.

120.   Experian's unfair conduct resulted in substantial injuries to Plaintiff and the Class which Plaintiff and the Class could not have reasonably avoided.

121.   Plaintiff and the Class members have suffered injuries as a direct and proximate result of Experian's acts as alleged herein. Plaintiff and the Class have suffered damages through the purchase of credit and identity theft monitoring service and the fees associated therewith, as well as the time invested by Plaintiff and the Class in protecting themselves from identity theft and other fraud as a result of Experian's breaches, in addition to the risk for future identity theft and fraudulent activity. Plaintiff and the Class have also lost the opportunity to control how their

private information is used, and the value of that personally identifying information has been diminished. Finally, Plaintiff and the Class have suffered and will continue to suffer from the costs associated with the inability to use credit and assets frozen or flagged as a result of credit misuse, tax fraud or other unauthorized charges or use of Plaintiff's financial, healthcare, or medical accounts.

122.   Plaintiff seeks to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendant, and all other relief allowed under CAL. BUS. & PROF. CODE § 17200.

**COUNT VII**
**VIOLATION OF THE OHIO CONSUMER SALES**
**PRACTICES ACT, OHIO REV. CODE § 1345.02**
**(On Behalf of Plaintiff and the Ohio State Class)**

123.  Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

124.   Plaintiff and Class members were deceived by Defendant's failure to properly implement adequate, commercially reasonable security measures to protect their private personal and financial information.

125.   Defendant's fraudulent and deceptive acts and omissions were intended to induce Plaintiff's and the other Class members' reliance on Defendant's deception that their personal and financial information was secure and protected.

126.   Plaintiff and Class did in fact rely on these acts or omissions.

127.   Defendant instead mishandled Plaintiff's and the other Class members' personal information in such manner that it was compromised.

128.   Defendant failed to follow industry best practices concerning data theft or was negligent in preventing such data theft from occurring.

129.   It was foreseeable that Defendant's willful indifference or negligent course of conduct in handling their customers' personal information would put that information at risk of compromise by data thieves.

130.   Defendant benefited from mishandling customers' personal information because, by not taking preventative measures that would have prevented the data from being compromised, Defendant saved on the cost of those security measures.

131.   Defendant violated Ohio Rev. Code § 1345.02 by failing to properly implement adequate, commercially reasonable security measures to protect Plaintiff's and the other Class members' private personal and financial information, by failing to warn them that their information was at risk, and by failing to discover and immediately notify affected customers of the nature and extent of the Security Breach.

132.   Defendant failed to comply with Ohio Rev. Code §§ 1345.02(A)-(B)(2), which provides:

(A) No supplier shall commit an unfair or deceptive act in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

(B) Without limiting the scope of division (A) of this section, the actor or practice of a supplier in representing any of the following is deceptive: . . .

> (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not . . . .

133.   ORC § 1345.09 provides that a "consumer has a cause of action and is entitled to relief" for violations of ORC § 1345.02.

134.   ORC § 1345.09(D) additionally provides that where the violation was an act prohibited by section 1345.02, "any consumer may seek a declaratory judgment, an injunction, or other appropriate relief against an act or practice that violates this chapter."

135.   Plaintiff and the other members have suffered injury in fact and actual damages including lost money and property as a result of Defendant's violations of ORC § 1345.02.

136.   Plaintiff's and the other Class members' injuries were proximately caused by Defendant's fraudulent and deceptive behavior, which was conducted with reckless indifference toward the rights of others, such that an award of punitive damages is appropriate.

137.   By this conduct, Defendant violated the Ohio Consumer Sales Practices Act, ORC § 1345 *et seq*., and Plaintiff seeks monetary damages, including damages related to the acquisition of identity theft and credit monitoring services, injunctive and declaratory relief pursuant to ORC § 1345.09.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and members of the Class, respectfully requests that this Court:

A.   Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

B.   Appoint Plaintiff as the representative of the Class and his counsel as Class counsel;

C.   Award all actual, general, special, incidental, statutory, and consequential damages to which Plaintiff and Class members are entitled;

D.   Award pre-judgment and post-judgment interest on such monetary relief;

E.   Grant appropriate injunctive and/or declaratory relief;

F.   Award reasonable attorneys' fees and costs; and

G.   Grant such further relief that this Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury on all issues so triable.

Dated: October 22, 2015

Respectfully submitted,

By:   /s/ Jason S. Hartley
Jason S. Hartley
Jason M. Lindner
**STUEVE SIEGEL HANSON LLP**
550 West C Street, Suite 1750
San Diego, CA 92101
Tel: 619-400-5822
Fax: 619-400-5832

Norman E. Siegel
Barrett J. Vahle
J. Austin Moore
(*pro hac vice forthcoming*)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City MO 64112
Tel: 816-714-7100
Fax: 816-714-7101
siegel@stueveseigel.com
vahle@stueveseigel.com
moore@stueveseigel.com

Vincent J. Esades
David Woodward
(*pro hac vice forthcoming*)
**HEINS MILLS & OLSON, P.L.C.**
310 Clifton Avenue
Minneapolis, MN 55403
Tel.:  (612) 338-4605
Fax:  (612) 338-4692
vesades@heinsmills.com
dwoodward@heinsmills.com

Daniel R. Karon (*pro hac vice forthcoming*)
**KARON LLC**
700 W. St. Clair Avenue, Suite 200
Cleveland, OH 44113
Tel: (216) 622-1851
Fax: (216) 241-8175
dkaron@karonllc.com

CLASS ACTION COMPLAINT

Katrina Carroll
Kyle A. Shamberg
(*pro hac vice forthcoming*)
**LITE DEPALMA GREENBERG, LLC**
211 W. Wacker Drive
Suite 500
Chicago, IL 60613
(312) 750-1265
kcarroll@litedepalma.com
kshamberg@litedepalma.com

CLASS ACTION COMPLAINT